IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

DANA ALEGRIA,                    §
                                 §
          Plaintiff,             §
                                 §
v.                               §
                                 §
THE STATE OF TEXAS, LARRY        §        CIVIL ACTION NO. G-06-0212
WILLIAMS, Individually and in    §
His Official Capacity, and       §
EDDIE KELLY, Individually and    §
in His Official Capacity,        §
                                 §
          Defendants.            §

## MEMORANDUM OPINION AND ORDER

Plaintiff, Dana Alegria, brings this action pursuant to 42 U.S.C. § 1983 and Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, et seq., for sexual harassment and violation of rights guaranteed by the Fourteenth Amendment to the United States Constitution against defendants, the State of Texas and Larry Williams and Eddie Kelly in both their official and individual capacities.  Pending before the court are Defendant Edward Kelly's Motion for Summary Judgment Based on Qualified Immunity (Docket Entry No. 30) and Defendants Larry Williams and Edward Kelly in Their Official Capacity's and the State of Texas Motion for Summary Judgment (Docket Entry No. 31).  For the reasons explained below the motion for summary judgment urged by Kelly in his individual capacity will be granted, the motion for summary judgment urged by

the State of Texas and Williams and Kelly in their official capacities will be denied, and the plaintiff will be required to show cause why the court should not <u>sua sponte</u> dismiss or grant summary judgment on all the remaining claims except the § 1983 individual capacity claims alleged against Williams.

## I.   Factual and Procedural Background

### A.   Factual Background

In 1999 plaintiff began serving a ten-year term of probation with the Galveston County Community Supervision and Corrections Department (GCCS&CD).  At all times relevant to this action Kelly served as Director of the GCCS&CD.  In September of 2005 Williams became plaintiff's community supervision officer.  Plaintiff alleges that Williams made unwanted sexual advances towards her that included inappropriate touching.  In January of 2006 plaintiff reported Williams' behavior to Carol Atkins, chief investigator for the Galveston County District Attorney's office.  Atkins suggested that plaintiff document her allegations by enclosing a tape recorder in her purse during her next visit with Williams.  On Thursday, January 12, 2006, plaintiff taped her meeting with Williams and then went to the District Attorney's office.  On January 20, 2006, plaintiff met with Kelly, who allegedly "made the statement to Plaintiff that the next time something like that happened, she should 'say no' and come talk to him."[1]  When Kelly

---

[1]Plaintiff, Dana Alegria's Third Amended Complaint, Docket Entry No. 25, p. 6 ¶ 21.

confronted Williams about the plaintiff's allegations in January of 2006, Williams resigned.[2]

## B.  Procedural Background

Plaintiff filed her Original Complaint on April 4, 2006 (Docket Entry No. 1).  In it she asserted claims against Williams and Galveston County for the violation of rights guaranteed by the Fourteenth Amendment to the United States Constitution and Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, et seq. Plaintiff sought compensatory damages, declaratory judgment, implementation of a policy designed to protect female probationers, costs, and attorney's fees.[3]

Motions to Dismiss were filed by Galveston County on June 12, 2006 (Docket Entry No. 5), and by Williams in his official capacity on June 27, 2006 (Docket Entry No. 8).

On June 27, 2006, plaintiff filed her First Amended Complaint (Docket Entry No. 9).  In it she explained that

> [t]his amended complaint is filed in order to dismiss one
> [d]efendant, County of Galveston, Texas, and to modify
> the complaint against Larry Williams to reflect that the
> complaint is brought against him in his official capacity

---

[2]See Affidavit of Edward Kelly, Exhibit A attached to Defendant Edward Kelly's Motion for Summary Judgment Based on Qualified Immunity, Docket Entry No. 30, and Defendants Larry Williams and Edward Kelly in Their Official Capacity's and the State of Texas Motion for Summary Judgment (Kelly Affidavit), Docket Entry No. 31, second unnumbered page.

[3]Plaintiff, Dana Alegria's, Original Complaint, Docket Entry No. 1, pp. 9-10.

as opposed to his individual capacity, and to bring the State of Texas into the lawsuit as an entity.[4]

Plaintiff continued to assert claims for the violation of rights guaranteed by the Fourteenth Amendment to the United States Constitution and Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, et seq., and to seek compensatory damages, declaratory judgment, implementation of a policy designed to protect female probationers, costs, and attorney's fees.

On July 27, 2006, plaintiff filed a response to Williams' motion to dismiss (Docket Entry No. 12); and on August 8, 2006, plaintiff filed a motion seeking leave to file a Third Amended Complaint (Docket Entry No. 13).

On September 7, 2006, the court issued an Order Granting in Part and Denying in Part Defendant's Motion to Dismiss (Docket Entry No. 15). The court dismissed the claims for compensatory damages based on the violation of rights guaranteed by the Fourteenth Amendment that the plaintiff had asserted against the State of Texas and Williams in his official capacity, and denied the motion to dismiss plaintiff's claims for injunctive relief. The court stated that "[t]he live [c]omplaint in this case is Plaintiff's First Amended Complaint which alleges constitutional and Title IX violations against the State of Texas and Williams in

---

[4]Plaintiff, Dana Alegria's, First Amended Complaint and Voluntary Stipulation of Dismissal of the County of Galveston, Docket Entry No. 9, p. 1.

-4-

his official capacity only."[5]   The court justified its dismissal of plaintiff's claims for compensatory damages by stating that plaintiff had alleged her Fourteenth Amendment claims pursuant to 42 U.S.C. § 1983 and explaining that

> [w]hile Section 1983 does provide private plaintiffs with a cause of action against certain defendants for civil rights violations, it cannot be asserted against a state entity. . . . The Eleventh Amendment to the United States Constitution explicitly bars federal suits against states. . . . Section 1983 does not waive this immunity. . . . Since the State of Texas has not consented to suit under Section 1983, Plaintiff's Section 1983 claims for damages must be dismissed.  There is simply no jurisdiction in this Court for a damages claim against the State of Texas for alleged violations of Section 1983.
>
> This reasoning is equally applicable to Defendant Williams since he is sued in his official capacity.  "It is well settled that 'official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.'" . . . Thus, the Court affords Plaintiff's § 1983 claims against Williams in his official capacity the same treatment that it would afford a § 1983 claim against the State itself. . . . Accordingly, Plaintiff's claim for money damages against Williams [is] likewise barred.[6]

The court also noted "for the record that Plaintiff's Response to Defendant's Motion concedes the conclusions that the Court reaches in this section."[7]   Citing <u>Ex parte Young</u>, 28 S.Ct. 441 (1908), the court declined to dismiss plaintiff's claims for injunctive relief observing that

---

[5]Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, Docket Entry No. 15, p. 1.

[6]<u>Id.</u> at 2-3 (citations omitted).

[7]<u>Id.</u> at 3 n.3.

> [t]hough Plaintiff does not rely on the Young doctrine by
> name, she clearly is calling on its authority by arguing
> that her suit for injunctive relief may proceed.
>
> Defendants have not yet responded to this argument
> as it relates to the specific facts of this case.
> Additionally, there is now before the Court a Motion to
> Amend Plaintiff's Complaint, which is awaiting a response
> from Defendants.  The Court finds that it cannot fully
> consider the merits of this argument until the correct
> Parties are before the Court and all have had a chance to
> brief the applicability of the Young doctrine to this
> case.[8]

On December 1, 2006, the court granted plaintiff's motion to

amend (Docket Entry No. 24), and on December 4, 2006, Plaintiff,

Dana Alegria's Third Amended Complaint was filed (Docket Entry

No. 25).  In it the plaintiff explains that

> [t]his third amended complaint is filed in order to add
> Eddie Kelly as a party.  Kelly was Defendant Williams'
> supervisor at the time of the occurrences giving rise to
> this action. . . . Plaintiff therefore brings this action
> against the State of Texas, Larry Williams, individually
> and in his official capacity, and Eddie Kelly, individ-
> ually and in his official capacity.[9]

Plaintiff's Third Amended Complaint asserts "that Title IX waives

the State's Eleventh Amendment protection,"[10] and that "[t]he

conduct of Eddie Kelley [sic] amounts to deliberate indifference to

[her] constitutional rights."[11] Plaintiff's Third Amended Complaint

seeks compensatory damages, declaratory judgment, implementation of

---

[8]Id. at 3-4.

[9]Plaintiff, Dana Alegria's, Third Amended Complaint, Docket
Entry No. 25, p. 1.

[10]Id. at 11.

[11]Id.

a policy designed to protect female probationers, costs, and attorney's fees "against both defendants,"[12] and exemplary damages from "Williams individually."[13]

## II.  <u>Standard of Review</u>

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment.  Fed. R. Civ. P. 56(c).  Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S.Ct. 2505, 2511 (1986).  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 106 S.Ct. 2548, 2552 (1986).  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not <u>negate</u> the elements of the nonmovant's case." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (<u>en banc</u>), (quoting <u>Celotex</u>, 106 S.Ct. at 2553-2554).  If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond

---

[12]<u>Id.</u>

[13]<u>Id.</u>

the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. Id. (citing Celotex, 106 S.Ct. at 2553-2554). In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products Inc., 120 S.Ct. 2097, 2110 (2000). Factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Little, 37 F.3d at 1075.

### III.   Individual Capacity Claims Asserted Against Kelly

Plaintiff asserts individual capacity claims for damages against Williams for violation of her right to bodily integrity protected by the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983, and against Kelly for failing to train and/or supervise Williams. Kelly argues he is entitled to qualified immunity on the § 1983 claims for damages that plaintiff has asserted against him in his individual capacity.

### A.   Applicable Law

Plaintiff alleges that Kelly . . .

was Larry Williams' supervisor. Kelly failed to ensure that Williams underwent proper training and/or failed to properly supervise Williams.

-8-

Kelly had previous notice of offending events in the Department with regards to women and did little to address harassment by probation officers against employees and/or outsiders.  When presented with the problem, Kelley [sic] attempted to hide the events from the district judges and/or misstated the extent of the problem.

Kelly's comments to Plaintiff were consistent with how the Department dealt with complaints, ignoring that women using the services in the department were entitled to protection from sexual harassment in context of services rendered.

Kelly's failure to adequately train and/or supervise Williams and others led to the pervasive attitude in the Department. When the "irrefutable" evidence of Williams' suckling the breast of Plaintiff was presented, Williams was allowed to resign instead of termination.

. . .

The conduct of Eddie Kelley [sic] amounts to deliberate indifference. . . .[14]

1.   Section 1983

"Section 1983 creates a private right of action for redressing the violation of federal law by those acting under color of state law. . . It is not itself a source of substantive rights, but merely provides a method for vindicating federal rights conferred elsewhere."[15]  Colson v. Grohman, 174 F.3d 498, 504 n.2 (5th Cir.

---

[14]Id. at 8-9 ¶¶ 28-31 and 11 ¶ 39.

[15]Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction
(continued...)

1999) (citing Migra v. Warren City School District Board of Education, 104 S.Ct. 892 (1984), and Albright v. Oliver, 114 S.Ct. 807 (1994)).  Section 1983 ensures "that an individual ha[s] a cause of action for violations of the Constitution," Chapman v. Houston Welfare Rights Organization, 99 S.Ct. 1905, 1916 (1979), and it authorizes a cause of action based on the deprivation of civil rights guaranteed by other acts of Congress.  Id.

2.   Qualified Immunity

"The doctrine of qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions if the official's acts were objectively reasonable in light of the then clearly established law."  Thompson v. Upshur County, Texas, 245 F.3d 447, 456 (5th Cir. 2001) (citing Harlow v. Fitzgerald, 102 S.Ct. 2727, 2738 (1982)).  A two-part test is used in determining whether a § 1983 defendant is entitled to qualified immunity:   (1) whether the plaintiff has alleged a violation of a clearly established constitutional right, and (2) if so, whether the defendant's conduct was objectively reasonable in light of the clearly

---

[15](...continued)
thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . .

42 U.S.C. § 1983.

established law at the time of the incident.  Id. at 457 (citing
Hare v. City of Corinth, Mississippi, 135 F.3d 320, 325 (5th Cir.
1988)).  See also Saucier v. Katz, 121 S.Ct. 2151, 2156 (2001)
(articulating the two-part test).  A legal right is clearly
established if the contours of the right are "sufficiently clear
that a reasonable official would understand that what he is doing
violates that right." Thompson, 245 F.3d at 457 (quoting Anderson
v. Creighton, 107 S.Ct. 3034, 3039 (1987)).  "Once a defendant
pleads a defense of qualified immunity, '[o]n summary judgment, the
judge appropriately may determine, not only the currently
applicable law, but whether the law was clearly established at the
time an action occurred.'" Siegert v. Gilley, 111 S.Ct. 1789, 1793
(1991).  "The defendant's acts are held to be objectively
reasonable unless all reasonable officials in the defendant's
circumstances would have then known that the defendant's conduct
violated the United States Constitution or the federal statute as
alleged by the plaintiff." Thompson, 245 F.3d at 457 (citing
Anderson, 107 S.Ct. at 3039).  "The 'defendant's circumstances'
includes facts known to the defendant." Id.  "If reasonable public
officials could differ on the lawfulness of the defendant's
actions, the defendant is entitled to qualified immunity."
Blackwell v. Barton, 34 F.3d 298, 303 (5th Cir. 1994).  "Objective
reasonableness is a matter of law for the courts to decide[.]"
Goodson v. City of Corpus Christi, 202 F.3d 730, 736 (5th Cir.

-11-

2000) (quoting <u>Williams v. Bramer</u>, 180 F.3d 699, 702 (5th Cir. 1999)).  The plaintiff carries the burden of proving that qualified immunity does not apply.  <u>McClendon v. City of Columbia</u>, 305 F.3d 314, 323 (5th Cir. 2002), <u>cert. denied</u>, 123 S.Ct. 1355 (2003).

**B.    Application of the Law to the Facts**

   1.   <u>Clearly Established Constitutional Right</u>

   The plaintiff's § 1983 claim is grounded on allegations that Williams violated her constitutionally protected right to bodily integrity because Kelly failed to train and/or supervise Williams and failed to implement policies and procedures to protect probationers from sexually predatory correctional officers.  The Fifth Circuit held as early as 1981 that "[t]he right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process."  <u>Doe v. Taylor Independent School District</u>, 15 F.3d 443, 450-51 (5th Cir.) (en banc), <u>cert. denied sub nom.</u>, <u>Lankford v. Doe</u>, 115 S.Ct. 70 (1994) (quoting <u>Shillingford v. Holmes</u>, 634 F.2d 263, 265 (5th Cir. 1981)).  Kelly concedes that Williams' alleged actions, if true, violate plaintiff's clearly established constitutional rights.[16] Accordingly, the court concludes that the plaintiff has satisfied the burden of alleging the violation of a clearly established constitutional right.

---

   [16]Defendant Edward Kelly's Motion for Summary Judgment Based on Qualified Immunity and Brief in Support, Docket Entry No. 30, p. 9.

2.   <u>Objectively Reasonable</u>

Citing <u>Southard v. Texas Board of Criminal Justice</u>, 114 F.3d
539, 550 (5th Cir. 1997), Kelly argues that he is entitled to
qualified immunity from plaintiff's claim because plaintiff alleges
that he supervised Williams but "does not allege that [he] was
directly involved in her injuries,"[17] or that there is a "causal
link between his conduct and the injuries claimed by [the
plaintiff]."[18]

Supervisory officials, like Kelly, cannot be held liable under
§ 1983 for the actions of subordinates, like Williams, on a theory
of vicarious liability.   See <u>Monell v. Department of Social
Services of the City of New York</u>, 98 S.Ct. 2018, 2037 (1978) (no
respondeat superior liability in § 1983 actions).   See also
<u>Thompson v. Steele</u>, 709 F.2d 381, 382 (5th Cir.), <u>cert. denied</u>, 104
S.Ct. 248 (1983) (citing <u>Rizzo v. Goode</u>, 96 S.Ct. 598, 604-605, 607
(1976) ("[p]ersonal involvement is an essential element of a civil
rights cause of action" that requires plaintiff to establish an
affirmative link between her injuries and a defendant's personal
conduct), and <u>Coleman v. Houston Independent School District</u>, 113
F.3d 528, 534 (5th Cir. 1997) (only the direct acts or omissions of
government officials, not the acts of subordinates, will give rise
to individual liability under § 1983)).   Instead, a plaintiff must

---

[17]<u>Id.</u> at 10.

[18]<u>Id.</u>

show either that the supervisor was personally involved in the constitutional violation or that there is a "sufficient causal connection" between the supervisor's conduct and the constitutional violation.  Thompkins v. Belt, 828 F.2d 298, 304 (5th Cir. 1987). See also Southard, 114 F.3d at 550 ("[T]he misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor.").

(a)   Personal Involvement

In his affidavit Kelly states that he is the Director of the GCCS&CD, that he was appointed Director on July 1, 1996, and that in his role as Director he did not supervise the daily work of the community supervision officers like Williams.[19]  Kelly states that

> I never heard or received any reports from any Supervisor, or anyone else, that Williams was acting inappropriately with Alegria, other probationers, or any female employee of the Department prior to learning of Alegria's allegations.  I first learned of Alegria's allegations in January 2006, from the Galveston County District Attorney's office.  I immediately relieved Williams of his duties in the Department after the completion of an investigation into the allegations by the District Attorney.  After reviewing tapes in the possession of the District Attorney made by Alegria, I initiated the Department discipline process.  Williams resigned after the completion of a discipline meeting in which I confronted him with Alegria's allegations.

> I never personally observed Williams acting inappropriately towards females.  I never received complaints from any probationers that Williams made them feel uncomfortable.  I expected that his Supervisors or

---

[19]Kelly Affidavit, first unnumbered page.

someone else would report any inappropriate behavior to me for potential disciplinary action.[20]

Asserting that he had no information that Williams posed a threat to the plaintiff or to anyone else, Kelly argues that he is entitled to qualified immunity from plaintiff's § 1983 claims because "[i]t is objectively unreasonable to expect [him] to take action to prevent conduct by Williams which [wa]s unknown to [him]."[21]

Plaintiff has failed to present any evidence showing that Kelly personally participated in the sexual harassment to which Williams allegedly subjected the plaintiff. Nor has plaintiff presented any evidence showing that Kelly knew about plaintiff's allegations of sexual harassment until the Galveston County District Attorney's office informed him of them. Moreover, the uncontradicted evidence shows that as soon as Kelly was informed of the plaintiff's allegations, he took remedial action by suspending Williams and initiating disciplinary procedures against Williams that caused Williams to resign. Since plaintiff has failed to offer any evidence of contradictory facts, the court concludes that the plaintiff has failed to present any evidence from which a reasonable fact-finder could conclude that Kelly was personally involved in the harassment allegedly perpetrated by Williams.

---

[20]*Id.* at second unnumbered page.

[21]Defendant Edward Kelly's Motion for Summary Judgment Based on Qualified Immunity and Brief in Support, Docket Entry No. 30, p. 10.

(b)  Causal Connection

Kelly argues that there is no causal connection between his actions or inactions because the summary judgment evidence establishes that he took quick and decisive action to address the lone prior incident of inappropriate sexual conduct by a community supervision officer, that he had no knowledge of plaintiff's allegations against Williams until informed of them by the District Attorney's office, and that plaintiff is unable to establish that any of his actions or inactions caused her injuries.[22]

Plaintiff does not argue that Kelly knew about Williams' harassment of her but, instead, that "Galveston County's Probation Department had an implicit policy of condoning sexual harassment, both of its probationers and employees."[23]  Plaintiff also argues that

> Kelly was the Director of the [GCCS&CD] and, contrary to
> his assertion herein, his actions were not in good faith
> and do not represent conduct the lawfulness of which a
> reasonable public official could differ.  Kelly turned a
> blind eye to the repeated conduct, took no action unless
> forced, and when forced he took the less forceful method
> to address the open violations of others' rights.
> Kelly's inaction is consistent with the Court's
> admonishment in Davis v. Monroe County Bd. of Educ.[, 119
> S.Ct. 1661 (1999),] in that he deliberately ignored the
> conduct and ignored his supervisory responsibility under
> federal law (City of Canton, Ohio v. Harris, 489 U.S.
> 378, 389-90[, 109 S.Ct. 1197, 1205] (1989) (supervisor

_____

[22]Id. at 11.

[23]Plaintiff, Dana Alegria's, Response to Defendants', Edward Kelly and Larry Williams and the State of Texas, Motion for Summary Judgment, Docket Entry No. 32, pp. 25-26.

-16-

consciously disregarded a risk of future violations of clearly established constitutional rights by badly trained employees).[24]

An official is liable under § 1983 for a failure to train or supervise only when the plaintiff establishes that

> (1) the [official] failed to train or supervise the [employees] involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights.

Thompson, 245 F.3d at 459. See also City of Canton, Ohio, 109 S.Ct. at 1205 ("[T]he inadequacy of [governmental] training [or supervision] may serve as the basis for § 1983 liability only where the failure to train [or supervise] amounts to deliberate indifference to the rights of persons with whom the [government personnel] come into contact."). Proof of deliberate indifference generally requires a showing "of more than a single instance of the lack of training or supervision causing a violation of constitutional rights." Thompson, 245 F.3d at 459. Instead, deliberate indifference generally requires that a plaintiff demonstrate "at least a pattern of similar violations" arising from lack of training or supervision and "the inadequacy of the training [or supervision] must be obvious and obviously likely to result in a constitutional violation." Id. Moreover, there must be a link between the pattern of similar violations and the particular

---

[24]Id. at 26.

-17-

constitutional violation alleged.  See City of Canton, Ohio, 109 S.Ct. at 1206 ("for liability to attach in this circumstance the identified deficiency in a [governmental] training program must be closely related to the ultimate injury").  See also Board of the County Commissioners of Bryan County, Oklahoma v. Brown, 117 S.Ct. 1382, 1391 (1997).  After carefully reviewing the summary judgment evidence the court concludes that the plaintiff has failed to raise a genuine issue of material fact as to whether Kelly's failure to train and/or supervise his employees reflected deliberate indifference to the risk that plaintiff or any other probationer would suffer sexual harassment at the hands of Williams or any other community supervision officer.

In his affidavit Kelly states that Williams, along with all the other Community Supervision Officers in Galveston County was provided a copy of a code of ethics that forbid the conduct he allegedly engaged in with the plaintiff.  Kelly expressly states that

> Larry Williams' alleged conduct with Alegria violated the Code of Ethics written by the Texas Department of Criminal Justice-Community Assistance Division and adopted by each Community Supervision and Corrections Department in the State of Texas which provides in pertinent part:
>
> . . .
>
> A Community Supervision Officer shall supervise defendants with fairness and competency. . . .

A Community Supervision Officer shall
maintain a professional relationship with the
individuals the officer is supervising. A
Community Supervision Officer shall not use
his or her authority as a supervising officer
or his or her position to extract any personal
gain from a defendant or exert any undue
duress or harassment of any defendant. . . .

. . .

All [GCCS&CD] employees were provided a copy of this
code of ethics. Larry Williams, and every other
Community Supervision Officer in the State of Texas,
knows, or should know, that the conduct alleged by
Alegria is forbidden by their code of ethics.[25]

These statements from Kelly's affidavit constitute evidence that
Williams and his fellow Galveston County Community Supervision
Officers received a code of ethics that forbid the conduct Williams
is alleged to have engaged in with the plaintiff. Plaintiff has
failed to present any evidence that contradicts this evidence that
Williams and his colleagues received at least some relevant
training for their positions as Community Supervision Officers.

In his affidavit Kelly states that during his tenure as
Director of the GCCS&CD there has only been one other incident in
which another Community Supervision Officer engaged in inappro-
priate sexual conduct with a probationer. Kelly expressly states
that

[d[uring my tenure as the Director of the [GCCS&CD] there
has only been one incident that I was made aware of at
the time that it occurred involving inappropriate conduct
of a sexual nature between a Community Supervision

_____

[25]Kelly Affidavit, second and third unnumbered pages.

-19-

> Officer and a person under that Officer[']s supervision.
> I received this complaint on July 1, 2003, from the
> probationer and immediately contacted and met with the
> Pasadena Police Department to initiate an investigation.
> I was asked by Detectives to allow them to complete their
> investigation of the allegations before taking any
> disciplinary action against the Community Supervision
> Officer.  On July 10, 2003, the Detectives contacted the
> Community Supervision Officer for his statement whereupon
> he resigned that night by leaving a message on his
> Supervisor[']s office telephone and placing a letter of
> resignation dated July 11, 2003, in her office mail box
> without ever returning to work.  He was subsequently
> indicted for Official Oppression in Harris County and was
> placed on Community Supervision for that offense.[26]

These statements from Kelly's affidavit constitute evidence that

the only other incident during his tenure as Director of the

GCCS&CD in which a Community Supervision Officer was alleged to

have engaged in inappropriate sexual conduct with a probationer

occurred over two years before incidents alleged in this case, that

Kelly took immediate action to remedy the situation by reporting

the allegations to the police and cooperating in the investigation

that ensued.  This evidence also establishes that the Community

Supervision Officer involved in the 2003 incident was prosecuted

and placed on community supervision for his actions.  Despite her

conclusory assertion that Kelly "turned a blind eye to the repeated

conduct,"[27] plaintiff has failed to present any evidence that

contradicts Kelly's assertion that he took remedial action

---

[26]Id. at second unnumbered page.

[27]Plaintiff, Dana Alegria's, Response to Defendants', Edward
Kelly and Larry Williams and the State of Texas, Motion for Summary
Judgment, Docket Entry No. 32, p. 26.

immediately upon learning of the only other incident of alleged
sexual harassment of a probationer by a Community Supervision
Officer.

Citing employee complaints about the conduct of Community
Supervision Officers Travis Scoggins and Michael Ortega, plaintiff
argues that Kelly's response to these complaints evidence "benign
neglect" to "repeated offensive and sexually-laden conduct."[28]
However, plaintiff has neither alleged nor argued that there is a
causal connection between Kelly's "benign neglect" to employee
complaints about Scoggins and/or Ortega and the harassment she
allegedly suffered at Williams' hands.  Nor has plaintiff cited any
evidence from which a reasonable fact-finder could conclude that
there exists a causal connection between Kelly's response to
employee complaints about Scoggins and Ortega and her alleged
harassment.  Moreover, since any evidence of "benign neglect"
demonstrated by Kelly's response to the complaints about Scoggins'
and Ortega's conduct would necessarily fall short of the
"deliberate indifference" required to prove supervisory liability
under § 1983, the court concludes that Kelly's responses to the
complaints about Scoggins' and Ortega's conduct are necessarily
insufficient to raise a genuine issue of material fact for trial.

The plaintiff has failed to point to any evidence that Kelly
learned of facts or a pattern of sexual harassment that would have

---

[28]Id. at 3 n.4.  See also id. at 11-12 n.12 (mentioning the
allegedly offensive conduct of three GCCS&CD employees: Scoggins,
Ortega, and Bernardo Almaraz).

led a reasonable official to believe that his failure to train and/or supervise Williams or any other Community Supervision Officer was "obviously likely to result in a constitutional violation" like that of which the plaintiff complains.   See Thompson, 245 F.3d at 459.   To the contrary, the summary judgment evidence shows that when Williams' harassment of the plaintiff was brought to Kelly's attention, Kelly took immediate and firm remedial action.   The evidence also shows that Kelly took immediate and firm remedial action when, over two years earlier, another Community Supervision Officer (Bernardo Almaraz) attempted to sexually assault a probationer during a home visit.   Since plaintiff has failed to present any evidence demonstrating "a pattern of similar violations" arising from lack of training and/or supervision of Community Supervision Officers that is so clearly inadequate as to be "obviously likely to result in a constitutional violation," id., the court concludes that the plaintiff has failed to raise a genuine issue of material fact for trial as to whether the constitutional violation of which plaintiff complains was causally connected to Kelly's failure to train and/or supervise his employees, or whether Kelly's failure to train and/or supervise his employees reflects deliberate indifference to the risk that plaintiff would suffer sexual harassment at Williams' hands.

## C.   Conclusions

For the reasons explained above, the court concludes that Kelly is entitled to qualified immunity from plaintiff's § 1983

claims for damages because plaintiff has failed to raise a genuine issue of material fact for trial as to whether Kelly was personally involved in Williams' alleged deprivation of her constitutional rights, or whether Kelly's failure to train and/or supervise his employees reflected deliberate indifference to the risk that plaintiff would suffer sexual harassment of constitutional dimension at Williams' hands.   Accordingly, Defendant Edward Kelly's Motion for Summary Judgment Based on Qualified Immunity (Docket Entry No. 30) will be granted.

### IV.   Title IX Claims Asserted Against the State of Texas and Williams and Kelly in Their Official Capacities

Defendants Williams and Kelly in their official capacities and the State of Texas argue that plaintiff's Title IX claims are barred by sovereign immunity pursuant to the Eleventh Amendment to the United States Constitution because the GCCS&CD is an arm of the State of Texas that does not receive federal financial assistance.[29] Plaintiff responds that her Title IX claims against these defendants are not barred by sovereign immunity because the GCCS&CD is part of the Texas Department of Criminal Justice (TDCJ), which receives federal funds.

---

[29]Defendants Larry Williams and Edward Kelly in Their Official Capacity's and the State of Texas Motion for Summary Judgment, Docket Entry No. 31, p. 5.   These defendants have not sought summary judgment on plaintiff's § 1983 claims for prospective injunctive relief.

**A.  Applicable Law**

    1.   Eleventh Amendment

    The Eleventh Amendment to the United States Constitution
states that "[t]he Judicial power of the United States shall not be
construed to extend to any suit in law or equity, commenced or
prosecuted against one of the United States by Citizens of another
State, or by Citizens or Subjects of any Foreign State."   See
Richardson v. Southern University, 118 F.3d 450, 452 (5th Cir.
1997), cert. denied, 118 S.Ct. 858 (1998) ("The Eleventh Amendment
. . . bars suits in federal court by citizens of a state against
their own state or a state agency or department.").   "While this
immunity from suit is not absolute, [the Supreme Court has]
recognized only two circumstances in which an individual may sue a
State."   College Savings Bank v. Florida Prepaid Postsecondary
Education Expense Board, 119 S.Ct. 2219, 2223 (1999).   First,
Congress may abrogate the states' sovereign immunity by authorizing
"such a suit in the exercise of its power to enforce the Fourteenth
Amendment -- an Amendment enacted after the Eleventh Amendment and
specifically designed to alter the federal -- state balance."   Id.
(citing Fitzpatrick v. Bitzer, 96 S.Ct. 2666 (1976)).   "Second, a
State may waive its sovereign immunity by consenting to suit."   Id.
(citing Clark v. Barnard, 2 S.Ct. 878 (1883)).

    2.   Title IX

    Title IX of the Education Act Amendments of 1972 provides that
"[n]o person in the United States shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  In response to arguments that Title IX claims asserted against state entities are barred by the Eleventh Amendment, the Fifth Circuit Court of Appeals has consistently held that "Title IX is Spending Clause legislation, and as a statute enacted under the Spending Clause, Title IX generates liability when the recipient of federal funds agrees to assume liability."  Pederson v. Louisiana State University, 213 F.3d 858, 876 (5th Cir. 2000) (quoting Rosa H. v. San Elizario Independent School District, 106 F.3d 648, 654 (5th Cir. 1997)).[30]  See also Gebser v. Lago Vista Independent School District, 118 S.Ct. 1989, 1997 (1998) (explaining that Title IX "condition[s] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds").

## B.   Analysis

### 1.   Arguments of the Parties

Defendants assert that

> Kelly is a current employee, and Mr. Williams is a
> former employee, of the [GCCS&CD] . . . which was created
> by Chapter 76 of the Texas Government Code.   The

---

[30]Other courts have concluded that 42 U.S.C. § 2000d-7 abrogates the states' sovereign immunity for Title IX claims because Congress enacted Title IX pursuant to the enforcement power granted by § 5 of the Fourteenth Amendment.  See Franks v. Kentucky School for the Deaf, 142 F.3d 360, 363 (6th Cir. 1998); Crawford v. Davis, 109 F.3d 1281, 1283 (8th Cir. 1997).

Plaintiff has sued Kelly and Williams in their official
capacities . . . which is therefore, a suit against the
[GCCS&CD]. . . .

    The [GCCS&CD] is an entity of the State of Texas
which enjoys 11th Amendment immunity from claims brought
under § 1983.[31]  Clark v. Tarrant County, Texas, 798 F.2d
736 (5th Cir. 1986).  In Clark, the court analyzed the
powers and characteristics of the Tarrant County
Probation Department as created by state law and
determined that it was an arm of the state within the
meaning of the Eleventh Amendment, and that the federal
courts lacked jurisdiction over the section 1983 claims
against it. . . . The [GCCS&CD] in this case has the same
powers and characteristics and was created under the same
statutory authority as the Tarrant County Probation
Department.  Therefore, the [GCCS&CD] is entitled to
Eleventh Amendment Immunity from the § 1983 claims
against it in this case and the court should dismiss
these claims for lack of subject matter
jurisdiction. . . .

Alegria asserts that the State of Texas receives federal
funding which waives Eleventh Amendment Immunity.
However, the real defendant in this case is the
[GCCS&CD].  Alegria alleges that all of her injuries
occurred as a result of her supervision by the [GCCS&CD].
Kelly and Williams were employees of the [GCCS&CD] at the
time of the incidents made the basis of this suit.
Furthermore, the claims against Williams and Kelly in
their official capacities are suits against their offices
with the [GCCS&CD]. . . .

The affidavit of Kelly, the Director of the [GCCS&CD]
responsible for preparing and executing the [GCCS&CD]'s
budget establishes that the [GCCS&CD] receives no federal

---

    [31]Although defendants' brief contains "§ 1983" in this place,
the sections of their brief titled "Summary of the Case," "Basis
for Summary Judgment," and "Relevant Summary Judgment Facts," make
clear that defendants are seeking summary judgment on plaintiff's
Title IX claims.  Moreover, plaintiff's § 1983 claims for
compensatory damages against the State of Texas were dismissed by
the September 7, 2006, Order Granting in Part and Denying in Part
Defendant's Motion to Dismiss (Docket Entry No. 15).

funds to operate.  Therefore, the Department's Eleventh
Amendment Immunity remains intact.[32]

In his affidavit Kelly stated

I am familiar with all sources of revenue received by the
[GCCS&CD] which are utilized to fund the operation of the
[GCCS&CD].  I am familiar with these revenue sources
through my duties with preparing and executing the
[GCCS&CD]'s budget.  The [GCCS&CD] receives State funds
from the [TDCJ]—Community Justice Assistance Division.
Additionally, persons on Community Supervision are Court
ordered to pay monthly Community Supervision Fees during
the time that they are supervised by the [GCCS&CD].  The
[GCCS&CD] does not receive any funds from the federal
government, and has never received federal funds during
my tenure as Director.[33]

Without disputing defendants' assertions that the GCCS&CD is

Kelly's employer and Williams' former employer, or that the

official capacity claims alleged against these two defendants are

claims asserted against their GCCS&CD offices, plaintiff argues

that her Title IX claims against Williams and Kelly in their

official capacities and against the State of Texas are not barred

by sovereign immunity because the GCCS&CD is part of the Texas

Department of Criminal Justice (TDCJ) and that TDCJ receives

federal funds.[34]  Plaintiff argues that

[t]he [GCCS&CD] is part of the [TDCJ] under Chapter 76 of
the Texas Government Code, and is an arm of the State of
Texas.  The [GCCS&CD] falls under the penumbra of the

---

[32]Defendants Larry Williams and Edward Kelly in Their Official
Capacity's and the State of Texas Motion for Summary Judgment,
Docket Entry No. 31, pp. 4-5 (citations omitted).

[33]Kelly Affidavit, third unnumbered page.

[34]Plaintiff, Dana Alegria's, Response to Defendants', Edward
Kelly and Larry Williams and the State of Texas, Motion for Summary
Judgment, Docket Entry No. 32, p. 2.

> language of [20 U.S.C.] § 1687.  The [TDCJ] receives
> federal funding.  The Defendant with some degree of
> creative writing submits, "[t]he [GCCS&CD] does not
> receive any Federal funding to operate, and therefore is
> entitled to 11th Amendment immunity from Alegria's claims
> under Title IX. . . Defendant does not hold out [to] the
> Court that the [GCCS&CD] is . . . a stand alone agency
> . . . not part of the [TDCJ].  Defendant does not provide
> to the Court that even the district judges are confused
> as to the status of the [GCCS&CD].[35]

Citing TDCJ's Fiscal Year 2005 Operating Budget and Fiscal Years

2006-2007 Legislative Appropriations Request plaintiff asserts that

"[t]he [GCCS&CD] is under the Community Justice Assistance Division

of the [TDCJ]."[36]

### 2.   Is GCCS&CD a Recipient of Federal Funds?

Defendants do not dispute plaintiff's contention that the

probation services provided to her by the GCCS&CD qualify as an

"educational program or activity" for purposes of Title IX.  See

Jeldness v. Pearce, 30 F.3d 1220, 1228-29 (9th Cir. 1994) (applying

Title IX to educational programs in a corrections context).

Instead, defendants argue that they are immune from plaintiff's

Title IX claims because the GCCS&CD is not "receiving Federal

financial assistance."  20 U.S.C. § 1681.  Citing 20 U.S.C. § 1687,

---

[35] Id. at pp. 10-11.

[36] Id. at n.11 (citing Exhibit 1 attached thereto showing that
"[d]efendant, State of Texas, applicable department of Criminal
Justice, for fiscal year 2004 received $967,356.00 in federal
funds; budgeted for fiscal year 2005 ($1,111,849.00); received
$22,908.878 in fiscal year 2004 for incarcerated aliens;
$17,126.820 for fiscal year 2005 for incarcerated aliens").

plaintiff argues only that Title IX's federal funding requirement is satisfied because GCCS&CD is a part of the TDCJ, and TDCJ is receiving federal financial assistance.

       (a)  Program or Activity

Plaintiff's argument that the probation services she receives from GCCS&CD are covered by Title IX because TDCJ receives federal funds rests on Title IX's expansive definition of "any educational program or activity" to include

all of the operations of–

(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government.

20 U.S.C. § 1687(1)(A)-(B); 34 C.F.R. § 106.2(h)(i)-(ii).  This definition was enacted by Congress to overturn the Supreme Court's opinion in Grove City College v. Bell, 104 S.Ct. 1211 (1984).

In Grove City College, 104 S.Ct. at 1211, the Supreme Court held that a college qualifies as a recipient of federal financial assistance when it enrolls students who receive federal funds earmarked for educational purposes.  Finding "no hint" that Title IX distinguishes between direct institutional assistance and indirect assistance received by a school through its students, the Court concluded that "Title IX coverage is not foreclosed because

federal funds are granted to Grove City's students rather than directly to one of the college's educational programs." Id. at 1219.  The Court reasoned that Congress ultimately intended colleges and universities to receive the grant money at issue, even if that money was transferred indirectly to the colleges and universities through their students.  Id.  However, interpreting the phrase "any education program or activity receiving Federal financial assistance," the Court held that receipt of federal grants by some of the college's students was not sufficient to trigger institution wide coverage under Title IX but, instead, only coverage for its financial aid program.  Id. at 1220-22.

Subsequently, Congress passed the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (1988).  This Act amended Title IX to circumvent the Supreme Court's narrow interpretation of the phrase "any education program or activity receiving Federal financial assistance," in Grove City College, to include the expansive interpretation now codified at 20 U.S.C. § 1687(1)(A)-(B). See also 34 C.F.R. § 106.2(h)(i)-(ii). See also S. Rep. No. 64, 100th Cong., 2d Sess. 3-4 (1988), reprinted in 1988 U.S.C.C.A.N. 3-4 (stating that the purpose of the Civil Rights Restoration Act of 1987 was "to overturn the Supreme Court's 1984 decision in Grove City College v. Bell . . . ., and to restore the effectiveness and vitality of the four major civil rights statutes

that prohibit discrimination in federally assisted programs").[37]
The legislative history of the Civil Rights Restoration Act of 1987
explained that

> Title IX of the Education Act Amendments of 1972
> prohibits sex discrimination in educational programs or
> activities receiving Federal financial assistance. . .

>                         . . .

> [In Grove City v. Bell t]he [Supreme] Court unanimously
> held that the student aid dollars reaching the college
> through its students constituted federal financial
> assistance to the school.  However, in determining the
> scope of the duty not to discriminate, a divided court
> interpreted the law's "program or activity" phrase
> narrowly.  Because the only Federal money reaching the
> college was in the form of student aid the Court
> concluded that only the financial aid office was covered
> by Title IX.  The rest of the college was left free to
> deny equal opportunities to women . . .

>                         . . .

> [The Civil Rights Restoration Act of 1987] will restore
> Title IX . . . to the broad, institution-wide application
> which characterized coverage and enforcement from the
> time of initial passage until the Grove City
> decision. . . . The Civil Rights Restoration Act of 1987
> amends each of the affected statutes by adding a section
> defining the phrase "program or activity" and "program"
> to make clear that discrimination is prohibited

---

[37]The four civil rights statutes are § 504 of the
Rehabilitation Act of 1973, 29 U.S.C.A. § 794, Title IX of the
Education Act Amendments of 1972, 20 U.S.C.A. § 1681, et seq., the
Age Discrimination Act of 1975, 42 U.S.C.A. § 6101, et seq., and
Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d,
et seq.  Because each of these statutes contains the same federal
funding requirement, courts asked to interpret that requirement in
the Title IX context often look for guidance to cases interpreting
it in these other contexts.  See, e.g., National Collegiate
Athletic Assoc. v. Smith, 119 S.Ct. 924, 928 n.3 (1999)
(acknowledging that the scope of these anti-discrimination statutes
is defined in nearly identical terms).

throughout entire agencies or institutions if any part receives Federal financial assistance. . . .

For education institutions, the bill provides that where federal aid is extended anywhere within a college, university, or public system of higher education, the entire institution or system is covered.  If federal aid is extended anywhere in an elementary or secondary school system, the entire system is covered.

For State and local governments, only the department or agency which receives the aid is covered.  Where an entity of state or local government receives federal aid and distributes it to another department or agency, both entities are covered.

. . .

For other entities established by two or more of the above-described entities, the entire entity is covered if it receives any federal aid.

Id. at 4 (Background), 6 (Summary of the Bill).

Since Congress's enactment of the Civil Rights Restoration Act of 1987, courts have had to determine whether individual states qualify as a "program or activity" under the Act's expanded definition of that phrase.  The courts that have considered this issue have unanimously held that Title IX's definition of the phrase "program or activity" does not encompass all the activities of a state but, instead, only covers all of the operations of the recipient of federal financial assistance, i.e., the department or the agency that receives the federal funds.  See Lightbourn v. County of El Paso, Texas, 118 F.3d 421, 426 (5th Cir. 1997), cert. denied sub nom., Lightbourn v. Garza, 118 S.Ct. 700 (1998) (holding that a Rehabilitation Act claim cannot be predicated on the fact

that a state receives federal financial assistance).  See also
Jim C. v. United States, 235 F.3d 1079, 1082 (8th Cir. 2000), cert.
denied sub nom., Arkansas Department of Education v. Jim C., 121
S.Ct. 2591 (2001) (waiver arising from acceptance of federal funds
by state's Department of Education covers all activities of the
Department of Education but is not broad enough to encompass all
activities of the state); Klinger v. Department of Corrections, 107
F.3d 609, 615 (8th Cir. 1997) (subset of Nebraska prisons comprised
of two correctional facilities "clearly does not constitute a
'program or activity' within the meaning of § 1687.  The Nebraska
prison system as a whole, however, does qualify as a 'program or
activity' within the statutory definition.").

> (b)   Is GCCS&CD a TDCJ Operation?

Citing Clark, 798 F.2d at 736, defendants contend that the
probation services provided to plaintiff were provided by the
GCCS&CD, which is a state entity entitled to sovereign immunity
pursuant to the Eleventh Amendment because it is not a recipient of
federal financial assistance.  In Clark female probation officers
sued Tarrant County and its adult probation department under
Title VII and 42 U.S.C. § 1983 alleging that they had been denied
promotions and paid less than men who performed similar work.  The
adult probation department argued, inter alia, that it was an arm
of the state and, therefore, entitled to Eleventh Amendment
immunity.  Clark, 798 F.2d at 739.  Explaining that "[i]n

determining whether an entity is entitled to Eleventh Amendment immunity, [courts] 'must examine the particular entity in question and its powers and characteristics as created by state law," id. at 744 (quoting Laje v. R.E. Thomason General Hospital, 665 F.2d 724, 727 (5th Cir. 1982)), the Clark court analyzed six factors before concluding that the Tarrant County Probation Department was an arm of the state entitled to sovereign immunity: (1) whether state statutes and case law view the entity as an arm of the state, (2) the source of the entity's funds, (3) the degree of local autonomy the entity enjoys, (4) whether the entity is concerned primarily with local, as opposed to statewide, problems, (5) whether the entity has the ability to sue and be sued in its own name, and (6) whether the entity has the right to hold and use property.   Id. at 744-45.   The Clark court concluded that (1) control of the adult probation offices rests with the district judges who are, undeniably, elected state officials; (2) part of adult probation's funding comes from the state and part from probation fees; (3) the controlling statute gives responsibility for the probation departments to the district judges; (4) the controlling statute was enacted to address a statewide problem and to put control of probationers in the hands of state officers, division of responsibilities into judicial districts is an administrative tool for handling a statewide program, and the adult probation employees are considered employees of the state for

purposes of suits involving negligence or violation of state or federal constitutional rights; and (5) adult probation is not given the right to sue or be sued in its own name. Id. "Viewing all the factors as a whole," the court held that the Tarrant County Adult Probation Department was "an arm of the state within the meaning of the Eleventh Amendment, and that the federal courts lack subject matter jurisdiction over [it]." Id. at 745.

In response to defendant's argument that they are entitled to sovereign immunity on plaintiff's Title IX claims because the GCCS&CD is an instrumentality of the state that does not receive federal financial assistance, plaintiff merely asserts that "[t]he [GCCS&CD] is part of the [TDCJ] under Chapter 76 of the Texas Government Code,"[38] and that GCCS&CD "is under the Community Justice Assistance Division of the [TDCJ]."[39]  Although plaintiff has not cited and the court has not found any section of Chapter 76 of the Texas Government Code providing that community supervision and corrections departments are under TDCJ's Community Justice Assistance Division or otherwise part of TDCJ, the court is unable to conclude that GCCS&CD is not a TDCJ operation.

In his affidavit, Kelly states that Williams' conduct with the plaintiff violated the Code of Ethics written by TDCJ's Community

---

[38]Plaintiff, Dana Alegria's, Response to Defendants', Edward Kelly and Larry Williams and the State of Texas, Motion for Summary Judgment, Docket Entry No. 32, pp. 10-11.

[39]Id.

Assistance Division and adopted by "each Community Supervision and Corrections Department in the State of Texas,"[40] and that the GCCS&Cd "receives State funds from the [TDCJ]—Community Assistance Division."[41]  These statements in Kelly's affidavit indicate that the TDCJ's Community Assistance Division is responsible for developing ethics policies that govern not just the community supervision officers in Galveston County but in the entire state, and that it also provides funds for GCCS&CD's operations. Moreover, since the <u>Clark</u> court held that (1) adult probation employees are considered employees of the state for purposes of suits involving negligence or violation of state or federal constitutional rights, (2) adult probation is not given the right to sue or be sued in its own name, and (3) division of responsibilities into judicial districts is an administrative tool for handling a statewide program, the court is persuaded that whether GCCS&CD is a recipient of federal financial assistance for purposes of Title IX because it is an operation of the TDCJ's Community Assistance Division or otherwise a part of TDCJ for purposes of the Civil Rights Restoration Act of 1987 presents a genuine issue of material fact for trial.  <u>See</u> 20 U.S.C. § 1687 (providing that Title IX applies to "all of the operations of-(1)(A) a department, agency, special purpose district, or other instrumentality of a State").

---

[40]Kelly Affidavit, second unnumbered page.

[41]<u>Id.</u> at third unnumbered page.

## C.    Conclusions

For the reasons explained above the court concludes that defendants' admission that GCCS&CD receives its ethics code and operating funds from TDCJ's Community Assistance Division precludes the court from concluding that GCCS&CD's is not a recipient of federal financial assistance and, instead, raises a genuine issue of material fact for trial as to whether GCCS&CD is an operation of TDCJ.  Accordingly, Defendants Larry Williams and Edward Kelly in Their Official Capacity's and the State of Texas Motion for Summary Judgment (Docket Entry No. 31) will be denied.

## V.    Conclusions and Order

For the reasons explained above, Defendant Edward Kelly's Motion for Summary Judgment Based on Qualified Immunity (Docket Entry No. 30) is **GRANTED**, and Defendants Larry Williams and Edward Kelly in Their Official Capacity's and the State of Texas Motion for Summary Judgment (Docket Entry No. 31) is **DENIED**.

The following claims remain in this case:  (1) Title IX claims for compensatory damages asserted against the State of Texas and against Williams and Kelly in both their official and individual capacities, (2) § 1983 claims for prospective injunctive relief asserted against Williams and Kelly in their official capacities, and (3) § 1983 claims for compensatory damages asserted against Williams in his individual capacity.   For the reasons explained

below, the plaintiff is **ORDERED TO SHOW CAUSE** by Friday, September 28, 2007, why the court should not <u>sua sponte</u> grant summary judgment or dismiss all of the remaining claims except for the § 1983 claims for compensatory damages asserted against Williams in his individual capacity. Plaintiff is **ORDERED** to file a written description -- including citations to the record and controlling case law -- of the factual and legal bases for the Title IX and the § 1983 claims for prospective injunctive relief remaining in this action. Given the age of this case the court is not likely to grant an extension of this deadline.

The Supreme Court has held that schools sued under Title IX for sexual harassment of a student by a teacher cannot be held liable on a theory of strict liability but, instead, must have actual knowledge of the harassment. <u>See</u> <u>Gebser</u>, 118 S.Ct. at 1997. The Court has also held that liability under Title IX will not lie unless the defendant that has control over the harasser acts with deliberate indifference to the harassment or otherwise fails to remedy it. <u>See</u> <u>Davis</u>, 119 S.Ct. at 1671. Based on the current record, the court is inclined to grant summary judgment <u>sua sponte</u> on the Title IX claims that plaintiff has asserted against the State of Texas and against Williams and Kelly in their official capacities because the uncontradicted evidence is that neither Kelly nor anyone else at the GCCS&CD knew that Williams was harassing the plaintiff until the Galveston County District

-38-

Attorney's office informed Kelly of plaintiff's allegations, and that as soon as Kelly learned of those allegations he took remedial action by suspending Williams and initiating disciplinary procedures that caused Williams to resign.

Since liability under Title IX only lies against programs or activities that receive federal financial assistance, the court is also inclined to dismiss sua sponte the Title IX claims that plaintiff has asserted or attempted to assert against Williams and Kelly in their individual capacities as not actionable. See Smith v. Metropolitan School District Perry Township, 128 F.3d 1014, 1019 (7th Cir. 1997), cert. denied, 118 S.Ct. 2367 (1998).

Since it is undisputed that Williams is no longer employed by the GCCS&CD, and since the court has already concluded that Kelly is entitled to summary judgment based on qualified immunity, the court is also inclined to grant summary judgment sua sponte on the § 1983 claims for prospective injunctive relief that plaintiff has asserted against Williams and Kelly in their official capacities because the plaintiff has failed to demonstrate a pattern of similar violations arising from lack of training or supervision that is so clearly inadequate as to be obviously likely to result in a future constitutional violation. See Henschen v. City of Houston, Tex., 959 F.2d 584, 588 (5th Cir. 1992 (quoting O'Shea v. Littleton, 94 S.Ct. 669, 675-76 (1974) (**"Past exposure** to illegal conduct does not in itself show a present case or controversy

regarding injunctive relief, [] if unaccompanied by any continuing, present adverse effects.")).

      **SIGNED** at Houston, Texas, this 11th day of September, 2007.

                                                                    SIM LAKE
                                      UNITED STATES DISTRICT JUDGE