IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

DANA ALEGRIA,                        §
                                     §
            Plaintiff,               §
                                     §
v.                                   §
                                     §
THE STATE OF TEXAS, LARRY            §    CIVIL ACTION NO. G-06-0212
WILLIAMS, Individually and in        §
His Official Capacity, and           §
EDDIE KELLY, Individually and        §
in His Official Capacity,            §
                                     §
            Defendants.              §

### MEMORANDUM OPINION AND ORDER

Plaintiff, Dana Alegria, brings this action pursuant to 42 U.S.C. § 1983 and Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, et seq., for sexual harassment and violation of rights guaranteed by the Fourteenth Amendment to the United States Constitution against defendants, the State of Texas and Larry Williams and Eddie Kelly in both their official and individual capacities.  For the reasons explained below, the court will sua sponte grant summary judgment on the Title IX claims alleged against Williams and Kelly in their individual capacities, and the Title IX and § 1983 claims alleged against the State of Texas and Williams and Kelly in their official capacities, leaving the § 1983 claim alleged against Williams in his individual capacity as the only claim remaining in this action.

## I.  __Factual and Procedural Background__

The factual background of this case is summarized in both the September 7, 2006, Order Granting in Part and Denying in Part Defendant's Motion to Dismiss,[1] and the September 11, 2007, Memorandum Opinion and Order.[2]  On September 7, 2006, the court dismissed the § 1983 claims for compensatory damages but declined to dismiss any § 1983 claims for prospective injunctive relief alleged against Williams in his official capacity under § 1983.[3] On December 1, 2006, the court granted plaintiff's motion to amend (Docket Entry No. 24), and on December 4, 2006, Plaintiff, Dana Alegria's, Third Amended Complaint was filed (Docket Entry No. 25). Plaintiff's Third Amended Complaint asserts Title IX and § 1983 claims against the State of Texas and against Kelly and Williams in both their individual and official capacities.  On September 11, 2007, the court dismissed the § 1983 claim for failure to train and supervise asserted against Kelly in his individual capacity, declined to dismiss the Title IX claims asserted against the State of Texas and the individual defendants in either their official or their individual capacities, and ordered the plaintiff to show cause "why the court should not __sua sponte__ grant summary judgment

---

[1]See Docket Entry No. 15, at p. 2.

[2]See Docket Entry No. 34, at pp. 2-3.

[3]See Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, Docket Entry No. 15, at pp. 2-4.

or dismiss all of the remaining claims except for the § 1983 claims for compensatory damages asserted against Williams in his individual capacity."[4]  The court directed the plaintiff "to file a written description -- including citations to the record and controlling case law -- of the factual and legal bases for the Title IX claims and for the § 1983 claims for prospective injunctive relief remaining in this action."[5]   In response plaintiff states that her

> Third Amended Complaint does not assert injunctive relief, therefore there is no need to brief this issue — however, Plaintiff did request declaratory relief.

> The briefing herein is directed to citations to the record and controlling case law supporting the factual and legal bases for the Title IX claim directed against the State of Texas.[6]

## II.   Standard of Review

The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element

---

[4]Memorandum Opinion and Order, Docket Entry No. 34, p. 38.

[5]Id.

[6]Plaintiff, Dana Alegria's, Pleading in Response to Court's Order to Show Cause Showing Factual and Legal Basis for Title IX Claims (Plaintiff's Response to Order to Show Cause), Docket Entry No. 35, p. 2.  Although the Clerk's record indicates that on October 22, 2007, plaintiff filed a Supplemental Response to Order to Show Cause, Docket Entry No. 36, the documents docketed as docket entry numbers 35 and 36 appear to be identical.

essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986). A district court may not generally "grant summary judgment sua sponte on grounds not requested by [a] moving party." Lozano v. Ocwen Federal Bank, FSB, 489 F.3d 636, 641 (5th Cir. 2007). However, an exception exists when the district court gives a party ten days' notice. Id. "This requirement places a party on notice that [s]he is in jeopardy of having [her] case dismissed and affords [her] the opportunity to put forth evidence to show precisely how [s]he intends to prove [her] case at trial." Doe on Behalf of Doe v. Dallas Independent School District (Doe I), 153 F.3d 211, 220 n.8 (5th Cir. 1998), cert. denied, 121 S.Ct. 766 (2001). Following at least ten days' notice, a district court may grant summary judgment sua sponte on grounds not urged in a pending motion. Lozano, 489 F.3d at 641 (citing Judwin Properties, Inc. v. U.S. Fire Ins. Co., 973 F.2d 432, 436-37 (5th Cir. 1992)). Because on September 11, 2007, the court ordered plaintiff to show cause "why the court should not sua sponte grant summary judgment or dismiss all of the remaining claims except for the § 1983 claims for compensatory damages asserted against Williams in his individual capacity,"[7] plaintiff has been on notice for more than ten days that summary judgment could be granted on all but one of the claims remaining in this action.

---

[7]Memorandum Opinion and Order, Docket Entry No. 34, p. 38.

### III.  <u>Title IX Claims</u>

**A.  Applicable Law**

Title IX of the Education Act Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  The Supreme Court has held that Title IX is enforceable through an implied right of private action against federal funding recipients, <u>Cannon v. University of Chicago</u>, 99 S.Ct. 1946 (1979), and that monetary damages are available in such actions.  <u>Franklin v. Gwinnett County Public Schools</u>, 112 S.Ct. 1028 (1992).

In <u>Franklin</u> a high school student alleged that a teacher had sexually abused her on repeated occasions and that teachers and school administrators knew about the abuse but took no action.  <u>Id.</u> at 1031.  The lower courts dismissed the student's complaint upon concluding that Title IX's implied right of action did not allow recovery of monetary damages.  <u>Id.</u> at 1032.  The Supreme Court reversed the lower courts' dismissals after concluding that Title IX supports a private action for damages, at least "in a case such as this, in which intentional discrimination is alleged."  <u>Id.</u> at 1037.  The Court's holding in <u>Franklin</u> established that a federal funding recipient can be held liable in damages in cases involving a teacher's sexual harassment of a student, but did not define the

-5-

contours of Title IX liability.  Id. ("when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex.' Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed. 49 (1986).  We believe the same rule should apply when a teacher sexually harasses and abuses a student.  Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe.").  See also Rosa H. v. San Elizaro Independent School District, 106 F.3d 648 (5th Cir. 1997) (holding that "minor students who have been subjected to a sexual relationship with their teachers have a private cause of action for monetary damages" under Title IX).

The Supreme Court addressed the contours of Title IX liability in Gebser v. Lago Vista Indep. Sch. Dist., 118 S.Ct. 1989 (1998). In Gebser the Court affirmed the Fifth Circuit's holding that school districts cannot be held liable for teacher-student sexual harassment unless an employee with supervisory power over the offending employee actually knew of the abuse, had the power to end it, and failed to do so.  Id. at 1994 (quoting Doe v. Lago Vista Independent School District, 106 F.3d 1223, 1226 ("school districts are not liable in tort for teacher-student [sexual] harassment under Title IX unless an employee who has been invested by the school board with supervisory power over the offending employee actually knew of the abuse, had the power to end the abuse, and

failed to do so"). The Court explained that the Fifth Circuit's decision was based in large part on its prior holding in Rosa H., 106 F.3d at 648, in which the Fifth Circuit declined to impose strict liability on a school district for a teacher's sexual harassment of a student, and its conclusion in Canutillo Independent School District v. Leija, 101 F.3d 393 (5th Cir. 1996), cert. denied, 117 S.Ct. 2434 (1997), that strict liability is inconsistent with Title IX. Gebser, 118 S.Ct. at 1994.

The Gebser petitioners argued to the Supreme Court that "in light of Franklin's comparison of teacher-student harassment, agency principles should likewise apply in Title IX actions." Id. at 1995. Relying on a "Policy Guidance" issued by the Department of Education (DOE), they also argued that school districts should be held

> liable in damages under Title IX where a teacher is "aided in carrying out the sexual harassment of students by his or her position of authority with the institution," irrespective of whether school district officials had any knowledge of the harassment and irrespective of their response upon becoming aware.

Id. Alternatively, the petitioners argued that "a school district should be liable for damages based on a theory of constructive notice, i.e., where the district knew or 'should have known' about harassment but failed to uncover and eliminate it." Id.

Asserting that "[b]oth standards [advanced by the petitioners] would allow a damages recovery in a broader range of situations than the rule adopted by the Court of Appeals, which hinges on

-7-

actual knowledge by a school official with authority to end the harassment," id., the Court acknowledged that "whether educational institutions can be said to violate Title IX based solely on principles of *respondeat superior* or constructive notice had not been resolved by its citation of Meritor Savings in Franklin." Id. Then, explaining that Franklin's reference to Meritor Savings "was made with regard to the general proposition that sexual harassment can constitute discrimination on the basis of sex under Title IX, the Court rejected the petitioner's reliance on principles of *respondeat superior* and constructive notice because, inter alia,

> Meritor's rationale for concluding that agency principles guide the liability inquiry under Title VII rests on an aspect of that statute not found in Title IX: Title VII, in which the prohibition against employment discrimination runs against "an employer," 42 U.S.C. § 2000e-2(a) explicitly defines "employer" to include "any agent," § 2000e(b). . . Title IX contains no comparable reference to an educational institution's "agents," and so does not expressly call for application of agency principles.

Id. at 1996.  Reasoning that "it would frustrate the purposes of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of *respondeat superior* or constructive notice, *i.e.*, without actual notice to a school district official," id. at 1997, the Court reiterated its "concern . . . with ensuring that the receiving entity of federal funds [have] notice that it will be liable for a monetary award." Id. at 1998.  Accordingly, the Court held that

> in cases like this one that do not involve official policy of the recipient entity . . . a damages remedy will not lie under Title IX unless an official who at a

minimum has authority to address the alleged
discrimination and to institute corrective measures on
the recipient's behalf has actual knowledge of
discrimination in the recipient's programs and fails
adequately to respond.

We think, moreover, that the response must amount to
deliberate indifference to discrimination. The adminis-
trative enforcement scheme presupposes that an official
who is advised of a Title IX violation refuses to take
action to bring the recipient into compliance.   The
premise, in other words, is an official decision by the
recipient not to remedy the violation.   That framework
finds a rough parallel in the standard of deliberate
indifference.  Under a lower standard, there would be a
risk that the recipient would be liable in damages not
for its own official decision but instead for its
employees' independent actions.   Comparable considera-
tions led to our adoption of a deliberate indifference
standard for claims under § 1983 alleging that a
municipality's actions in failing to prevent a
deprivation of federal rights was the cause of the
violation.

Id. at 1999.

Applying the actual notice/deliberate indifference framework

to the facts before it, the Gebser Court characterized the outcome

as "fairly straightforward, as petitioners do not contend they can

prevail under an actual notice standard."   Id.  The Court explained

that

[t]he only official alleged to have had information about
[the teacher's] misconduct is the high school principal.
That information, however, consisted of a complaint from
parents of other students charging only that [the
teacher] had made inappropriate comments during class,
which was plainly insufficient to alert the principal to
the possibility that [the teacher] was involved in a
sexual relationship with a student.   Lago Vista,
moreover, terminated [the teacher's] employment upon
learning of his relationship with [the complainant].
Justice STEVENS points out in his dissenting opinion that
[the teacher] of course had knowledge of his own actions

-9-

> . . . Where a school district's liability rests on actual
> notice principles, however, the knowledge of the
> wrongdoer himself is not pertinent to the analysis.

Id. at 2000.  The Court also rejected the petitioners' attempt to

ground liability on the school district's failure to promulgate and

publicize an effective policy and grievance procedure for sexual

harassment claims as required by the DOE's regulations because

"Lago Vista's alleged failure to comply with the regulations . . .

does not establish the requisite actual notice and deliberate

indifference.   And in any event, the failure to promulgate a

grievance procedure does not itself constitute 'discrimination'

under Title IX."  Id.

     Thus, following Gebser plaintiffs seeking to recover damages

for a teacher's sexual harassment of a student must establish that

(1) an employee of the federal funding recipient with supervisory

power over the alleged harasser (2) had actual knowledge of the

harassment and (3) responded with deliberate indifference.  Gebser,

118 S.Ct. at 1999.  "[T]o qualify as a supervisory employee whose

knowledge of abusive conduct counts as the [funding recipient's]

knowledge, . . . [an] official must at least serve in a position

with the authority to 'repudiate that conduct and eliminate the

[harassment]' on behalf of the [funding recipient]."  Rosa H., 106

F.3d at 661 (quoting Nash v. Electrospace System, Inc., 9 F.3d 401,

404 (5th Cir. 1993)).  Notice of harassment to employees who have

no authority beyond reporting the misconduct to other employees is

insufficient to expose a federal funding recipient to Title IX liability.  Id.

"[T]he plaintiff in a Title IX damages suit based on a teacher's behavior must prove actual knowledge of misconduct . . . and must also prove that the officials having that knowledge decided not to act on it."  Delgado v. Stegall, 367 F.3d 668, 674 (7th Cir. 2001).  The "actual knowledge" requirement is based on the subjective standard that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Rosa H., 106 F.3d at 658 (quoting Farmer v. Brennan, 114 S.Ct. 1970 (1994)).  An official decision by the school district not to remedy the violation requires that the supervisory employee's response "amount to deliberate indifference to discrimination."  Gebser, 118 S.Ct. at 1999.  See also Davis v. Monroe County Board of Education, 119 S.Ct. 1661 (1999) (defining Title IX deliberate indifference standard for student-to-student harassment as when the "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances").

In Davis, 119 S.Ct. at 1676, the Supreme court extended Gebser to allow school district liability for deliberate indifference to known acts of student-on-student sexual harassment.  In Davis the complainant alleged that her daughter had been subjected to repeated, severe, pervasive harassment that was not only verbal but

included numerous acts of objectively offensive touching by a fellow student over a five-month period, that multiple victims of the alleged wrongdoer's misconduct had sought an audience with the school principal, and that the school board made no effort to investigate the complaints or stop the harassment. <u>Id.</u> Applying the <u>Gebser</u> standard to the alleged facts, the Court held that the Eleventh Circuit erred in dismissing the case because the alleged facts suggested that the complainant might be able to show both actual knowledge and deliberate indifference on the part of the school board. Reasoning that a federal funding recipient cannot be held directly liable for its deliberate indifference absent the authority to take remedial action, the Court explained that if a funding recipient has not engaged in harassment directly, "it may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment. That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." <u>Id.</u> at 1672. The Court also explained that funding recipients may not be deemed deliberately indifferent to acts of student-on-student harassment unless the funding "recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." <u>Id.</u> at 1674.

Federal funding recipients may avoid liability under a deliberate indifference standard by responding reasonably to a risk

of harm, even if the response is unsuccessful.  <u>See</u> <u>Doe v. Dallas</u> <u>Independent School District</u>, 220 F.3d 380, 384 (5th Cir. 2000), <u>cert. denied</u>, 121 S.Ct. 766 (2001).  What constitutes appropriate remedial action for allegations of discrimination in Title IX cases depends on the particular facts of each case.  <u>Id.</u>

**B.   Individual Capacity Claims**

The court's September 11, 2007, Memorandum Opinion and Order stated that

> [s]ince liability under Title IX only lies against
> programs or activities that receive federal financial
> assistance, the court is . . . inclined to dismiss <u>sua</u>
> <u>sponte</u> the Title IX claims that plaintiff has asserted or
> attempted to assert against Williams and Kelly in their
> individual capacities as not actionable.  <u>See</u> <u>Smith v.</u>
> <u>Metropolitan School District Perry Township</u>, 128 F.3d
> 1014, 1019 (7th Cir. 1997), <u>cert. denied</u>, 118 S.Ct. 2367
> (1998).[8]

In <u>Rowinsky v. Bryan Independent School District</u>, 80 F.3d 1006 (5th Cir.), <u>cert. denied</u>, 117 S.Ct. 165 (1996), the Fifth Circuit dismissed a Title IX claim for student-on-student sexual harassment on grounds that Title IX imposes liability only for the acts of federal grant recipients.  <u>Id.</u> at 1012-13 ("As an exercise of Congress's spending power, Title IX makes funds available to a recipient in return for the recipient's adherence to the conditions of the grant.  While it is plausible that the condition imposed could encompass ending discriminatory behavior by third parties,

---

[8]Docket Entry No. 34, p. 39.

the more probable inference is that the condition prohibits certain behavior by the grant recipients themselves."). Although the Supreme Court has since recognized that Title IX liability extends to student-on-student harassment, <u>Davis</u>, 119 S.Ct. at 1676, the Court explained there that liability could only be based on the funding recipients' deliberate indifference to known acts of sexual harassment evidenced by its own failure to investigate complaints and eliminate harassment. <u>Id.</u> Although <u>Rowinsky</u>'s main conclusion that Title IX's implied right of private action did not encompass claims for student-on-student harassment has since been overturned, the Fifth Circuit's conclusion that liability under Title IX lies only for the acts of grant recipients appears to remain sound.

Reasoning that the private right to damages for violation of Title IX recognized by the Supreme Court is based on the theory that recipients of federal funding have acquiesced to suit in federal court, and that recipients of federal funding are not individuals but, instead, educational programs or activities, other circuit courts of appeals that have addressed this issue have held that Title IX does not permit actions against individuals. <u>See</u> <u>Lipsett v. University of Puerto Rico</u>, 864 F.2d 881, 884, 901 (1st Cir. 1988) ("the separate liability of the supervisory officials at the University must be established, if at all, under § 1983, rather than under Title IX"); <u>Lillard v. Shelby County Board of Education</u>, 76 F.3d 716, 730 (6th Cir. 1996) (Nelson, J., concurring) ("I do

-14-

not believe that Title IX can appropriately be read as subjecting anyone other than educational institutions to liability for violation of its terms."); Smith v. Metropolitan School District Perry Township, 128 F.3d 1014, 1019 (7th Cir. 1997), cert. denied, 118 S.Ct. 2367 (1998) (Title IX allows suits only against institutions; it does not allow suits against individual defendants); Kinman v. Omaha Public School District, 171 F.3d 607, 611 (8th Cir. 1999) ("Title IX will not support an action against [defendant] in her individual capacity"); Hartley v. Parnell, 193 F.3d 1263, 1270 (11th Cir. 1999) ("Individual school officials . . . may not be held liable under Title IX."). District courts in this circuit have also held that individuals may not be held liable under Title IX.  See Doe v. Hillsboro I.S.D., 81 F.3d 1395, 1400 n.9 (5th Cir. 1996) (observing that district courts in the Circuit have all ruled that individuals cannot be sued under Title IX). Because the court is persuaded that the reasoning relied upon by these courts is sound, the court concludes that the Title IX claims that plaintiff has asserted against Williams and Kelly in their individual capacities are not cognizable.

## C.   Official Capacity Claims and Claims Against the State of Texas

The court's September 11, 2007, Memorandum Opinion and Order stated that

> liability under Title IX will not lie unless the
> defendant that has control over the harasser acts with
> deliberate indifference to the harassment or otherwise
> fails to remedy it. See Davis, 119 S.Ct. at 1671. Based

on the current record, the court is inclined to grant
summary judgment <u>sua sponte</u> on the Title IX claims that
plaintiff has asserted against the State of Texas and
against Williams and Kelly in their official capacities
because the uncontradicted evidence is that neither Kelly
nor anyone else at the GCCS&CD knew that Williams was
harassing the plaintiff until the Galveston County
District Attorney's office informed Kelly of plaintiff's
allegations, and that as soon as Kelly learned of those
allegations he took remedial action by suspending
Williams and initiating disciplinary procedures that
caused Williams to resign.[9]

"[O]fficial capacity suits generally represent only another

way of pleading an action against an entity of which an officer is

an agent." <u>Monell v. Department of Social Services of the City of</u>

<u>New York</u>, 98 S.Ct. 2018, 2036 n.55 (1978).    Plaintiff argues that

[i]n the case at bar, the acts of Larry Williams, other
officers and supervisors were known to the [GCCS&CD]; the
conduct included the failure of the department to take
proactive corrective measures when placed on notice of
pervasive sexual comments and actions by its probation
officers and supervisors.  Even under the withering
criticism of state district judges, Edward Kelly refused
to inform the board of the offensive conduct, attempted
to hide the conduct, and simply told the judges to mind
their own business — he hid under the umbrella of being
a state employee.  According to the judges, the problem
with Kelly's logic was that the actions of the
supervisors and the probation officers spelled trouble
for female employees — and probationers and "not just the
pretty ones."[10]

Plaintiff also argues that

Kelly had the power to take corrective action with regard
to the impermissible conduct that was verbal, physical
and/or that bordered on harassment of female employees

---

[9]<u>Id.</u> at 38-39.

[10]Plaintiff's Response to Order to Show Cause, Docket Entry
No. 35, pp. 18-19.

> and probationers.  The facts show that Kelly was hostile
> to input by the district judges, allowed overt offenders
> to resign, and did not take action unless pushed.  The
> discovery revealed a department that was out of
> control.[11]

The gist of plaintiff's argument is that the State of Texas

possessed actual knowledge of a sexually charged environment at

GCCS&CD through complaints of sexually inappropriate conduct by

Williams and by three other individuals -- Miguel Ortega, Travis

Scoggins, and Bernardo Almaraz -- and that Kelly's failure to

implement a policy aimed at protecting probationers demonstrates

deliberate indifference to the risk of harm that the sexually

charged environment at GCCS&CD posed to plaintiff and other

probationers.  Plaintiff also argues that "the question of whether

summary judgment should be granted turns on the Court's

interpretation of deliberate indifference as either the

indifference relating only to the 'individual complainer' or

deliberate indifference relating to the entire record."[12]

Assuming without deciding that plaintiff's Title IX claims for

monetary damages against the State of Texas and against Williams

and Kelly in their official capacities are not barred by sovereign

immunity,[13] the court concludes that these defendants are entitled

---

[11]_Id._ at 21-22.

[12]_Id._ at 3.

[13]Defendants have not disputed plaintiff's assertions that the
probation services provided by the GCCS&CD qualify as an
"educational program or activity" under Title IX, or that Williams
and Kelly are agents of the State of Texas because GCCS&CD is "an
(continued...)

to summary judgment because plaintiff has failed to present summary judgment evidence from which a reasonable trier of fact could conclude that any state official with supervisory power over Williams had actual knowledge of the alleged harassment and responded thereto with deliberate indifference.

  1.   <u>Knowledge of Williams' Harassment of Plaintiff</u>

Plaintiff acknowledged in her deposition that she did not tell anyone at the GCCS&CD about Williams' harassment; plaintiff chose instead to complain first to family members and then in January of 2006 to the Galveston County District Attorney's office.[14] Plaintiff does not argue that once the District Attorney's office notified Kelly about her allegations that Kelly failed to

---

[13](...continued)
arm of the state."  Instead, the defendants have argued that they cannot be held liable under Title IX because GCCS&CD does not receive federal funds.  However, in its September 11, 2007, Memorandum Opinion and Order, the court concluded that whether the GCCS&CD is an operation of the Texas Department of Criminal Justice (TDCJ), which undisputedly receives federal funds, poses a genuine issue of material fact for trial.  See Docket Entry No. 34, pp. 33-37.  Although a finding that GCCS&CD is an operation of the TDCJ might make TDCJ a necessary party to this action, the court needs to reach this issue to conclude that the plaintiff's evidence is insufficient to hold whichever governmental entity Williams and Kelly represent liable under Title IX.

[14]See Deposition of Dana M. Alegria, Exhibit B attached to Docket Entry No. 30, pp. 31-32 (stating that in January of 2006 the plaintiff reported Williams' conduct to the Galveston County District Attorney's office but that she never reported Williams' conduct to Kelly or to anyone else at GCCS&CD).  See also Affidavit of Dana Alegria, Attachment 4 to Docket Entry No. 32 (stating that plaintiff reported Williams' conduct to the Galveston County District Attorney's office in January of 2006 and that she only talked to Kelly about it afterwards).

investigate them, or failed to stop Williams from harassing her. Instead, plaintiff argues that Kelly's reaction to her complaint was unreasonable because instead of firing Williams, he allowed Williams to resign.[15]  Because courts all measure the reasonableness of a funding recipient's response to actual notice of sexual harassment in terms of whether an investigation was conducted and the harassment stopped, and because the undisputed evidence in this case is that once Kelly received actual notice of plaintiff's allegations he confronted Williams and stopped the plaintiff's harassment, the court is not persuaded that plaintiff has raised a genuine issue of material fact regarding the reasonableness of Kelly's response to actual notice of Williams' harassment of plaintiff.

    2.  <u>Knowledge of Williams' Prior Harassment of Others</u>

Plaintiff argues that

> Williams' conduct was not isolated to Plaintiff.  Under Attachment 11, the Court will find an internal memorandum directed to Eddie Kelly dated February 9, 2006.  The Memorandum explained that another probationer had complained of Williams as early as December 2003.[16]

Plaintiff also argues that "[u]nder Attachment 12, the Court will find a letter from Kelly Bozeman who conveyed information [to Kelly

---

[15]Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, p. 22 (asserting that Kelly "allowed overt offenders to resign").

[16]<u>Id.</u> at 11.

about harassment by Williams] from another probationer, Karen Walton."[17]

    (a)  Bozeman Letter

The Bozeman letter is dated January 26, 2006.  It states that at about 1:30 that afternoon Shirley Shaw came to Bozeman's office to report a phone call that she had received from a defendant named Karen Walton who had once been supervised by Williams.  According to Shaw, Walton stated that Williams always "talked 'dirty'" to her, but that she had never reported his comments to anyone other than her current counselor.[18]  Since Bozeman testified that she was Williams supervisor when he resigned, that he resigned during the first two weeks of January of 2006,[19] and that she had "never had a complaint made to [her] until after Mr. Williams left . . . [the] department,"[20] her letter of January 26, 2006, does not support plaintiff's contention that Kelly or any other state official with supervisory power over Williams had actual notice of Williams' misconduct prior to notice of plaintiff's allegations.  At best, Bozeman's letter evidences only that at some unidentified time prior to the disclosure of plaintiff's allegations, defendant Karen

---

[17]Id. at 13.

[18]Bozeman Letter of January 26, 2006, Attachment 12 to Docket Entry No. 35.

[19]See Deposition of Kelly Bozeman, Attachment 6 to Docket Entry No. 32, p. 16.

[20]Id. at 11.

Walton reported to her counselor that Williams talked "dirty" to her.  Because plaintiff fails to present any evidence from which a reasonable trier of fact could conclude that Walton's counselor was a state official with supervisory power over Williams who responded with deliberate indifference to knowledge of Williams' misconduct, the court concludes that the Bozeman letter is insufficient to raise a genuine issue of material fact for trial.

> (b)  Ellis-Henry Internal Memorandum

The internal memorandum is dated January 26, 2007, and written by Robin Ellis-Henry, a probation officer, who states that around December of 2003 a probationer under her supervision named Rebecca Alaniz told her that she had been sexually harassed by Williams. Ellis-Henry states that Williams told Alaniz that if she would perform sexual favors for him, he would have her probation fees waived.[21]  Ellis-Henry states that after receiving this report, she gave Alaniz the number to the Office of Inspector General (OIG) and advised Alaniz to contact them with her complaint.  Ellis-Henry explained that she gave Alaniz the OIG's number because Alaniz was too afraid to tell Ellis-Henry's then supervisor, Magdalene Sanchez, about Williams' conduct because Alaniz feared jeopardizing her probation discharge.[22]  Plaintiff argues that

---

[21]See Attachment 11 to Plaintiff's Response to Order to Show Cause, Docket Entry No. 35.

[22]Id.  See also Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, pp. 11-12.

>    [i]nstead of the probation officer and then the
>    supervisor reporting the information to others in
>    authority and/or taking action, they put the burden on
>    Ms. Alaniz to report the same to the Office of the
>    Inspector General.  It should be noted that Ms. Sanchez
>    is a person of authority who could have taken action on
>    the complaint.[23]

Plaintiff argues that the failure of Ellis-Henry and/or Sanchez to report the complaint to Kelly and/or to take other corrective action shows "that the deliberate indifference[] as to the conduct in the department created [a sexually charged] atmosphere."[24]

   The Supreme Court's holding in Gebser that federal funding recipients cannot be held liable under Title IX unless they have actual knowledge of harassment left open the question of whether the federal funding recipient must have had actual knowledge that the plaintiff herself was subjected to sexual harassment, or whether knowledge that other individuals had been subjected to harassment is sufficient to support liability.  See Johnson v. Galen Health Institutes, Inc., 267 F.Supp.2d 679, 687 (W.D. Ky. 2003) (recognizing that the Court's analysis in Gebser left this question open).  Although the Fourth Circuit has interpreted Gebser's requirement of "actual knowledge of discrimination in the recipient's programs" to require "a showing that . . . [appropriate] officials possessed actual knowledge of the

---

[23]Id.

[24]Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, p. 12 n.17.

discriminatory conduct in question," <u>Baynard v. Malone</u>, 268 F.3d 228, 237-38 (4th Cir. 2001), <u>cert. denied</u>, 122 S.Ct. 1357 (2002), district courts have held that the funding recipient need only "have possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." <u>Johnson</u>, 267 F.Supp.2d at 687 (quoting <u>Folkes v. New York College of Osteopathic Med.</u>, 214 F.Supp.2d 273 (E.D.N.Y. 2002)).

Asserting that "[a]ctual knowledge of intentional discrimination and actual knowledge of the actual plaintiff's experiences are two different things," <u>id.</u> at 688, the <u>Johnson</u> court reasoned that the <u>Gebser</u> notice standard does not require actual notice of previous acts of harassment committed against the plaintiff by the alleged wrongdoer before a funding recipient may be held liable for the wrongdoer's misconduct. <u>Id.</u>  Instead, the court concluded that "the actual notice standard is met when an appropriate official has actual knowledge of a substantial risk of abuse . . . based on prior complaints by other[s]." <u>Id.</u>  An "appropriate official" is one who serves in "a position with the authority to repudiate . . . [the harassing] conduct and eliminate the discrimination on behalf of the [funding recipient]." <u>Rosa H.</u>, 106 F.3d at 661. <u>See also</u> <u>Gebser</u>, 118 S.Ct. at 1994 (affirming the Fifth Circuit's holding that Title IX liability attaches when an official who has been invested with supervisory power over the

offending employee actually knew of the abuse, had the power to end the abuse, and failed to do so).

Assuming without deciding that plaintiff may satisfy <u>Gebser</u>'s actual notice standard by presenting evidence from which a reasonable trier of fact could conclude that an appropriate official had actual knowledge of a substantial risk of abuse to probationers based on prior complaints by others, the court is still not persuaded that plaintiff has presented evidence capable of raising a genuine issue of material fact for trial. Although plaintiff has presented evidence that in 2003 Ellis-Henry communicated Alaniz's complaints about Williams' conduct to her supervisor, Sanchez, and has asserted that "Sanchez is a person of authority who could have taken action on the complaint,"[25] plaintiff has failed to present any evidence from which a reasonable fact finder could conclude that in 2003 (when Alaniz complained to Ellis-Henry) Sanchez had supervisory power over Williams, or that Sanchez's response to Ellis-Henry's report was unreasonable under the known circumstances. Instead, plaintiff asserts that

> [f]rom the factual record before this Court, Kelley clearly had authority to take corrective measures. Plaintiff contends that the Supervisor Officer Sanchez once informed about Larry Williams' conduct in 2003 had authority to address the grievance (Alaniz complaint) and institute corrective measures — include reporting to Kelley. By way of example, a current Community Supervision Supervisor explained that her role is to manage employees, ensure office policy and procedures are

---

[25] <u>Id.</u>

followed, to deal with Human Resource issues and to supervise case load management.

In the case of *Murrell v. School District No. 1, Denver, Colorado*, 186 F.3d 1238 (10th Cir. 1999), the Tenth Circuit when addressing the question of job titles declined to limit its analysis to a particular job title or positions (that would constitute the authority to address the alleged discrimination and to institute corrective measures). The Court explained that "deciding who exercises substantial control for the purposes of Title IX liability is necessarily a fact-based inquiry." *Id.* at 1247.[26]

Plaintiff's argument appears to be that at all times relevant to this case Kelly possessed the authority to investigate and correct Williams' conduct, but that as a supervisor, Sanchez possessed the authority to address Alaniz's complaint about Williams' misconduct and take corrective measures by reporting the complaint to Kelly. However, since the Fifth Circuit has held that notice of teacher-student harassment to employees who have no authority beyond reporting the misconduct to other school district employees is insufficient to expose a federal funding recipient to Title IX liability, Rosa H., 106 F.3d at 661, and since plaintiff has failed to present any evidence from which a reasonable fact finder could conclude that Sanchez possessed any authority beyond the ability to report Alaniz's complaint to Kelly, the court is not persuaded that evidence that Ellis-Henry reported Alaniz's complaint to Sanchez is sufficient to expose the State of Texas and/or the official capacity defendants to Title IX liability.

---

[26] *Id.* at 18 n.20.

Moreover, even if notice to Sanchez were sufficient to impose Title IX liability on these defendants, the court concludes that plaintiff has failed to present any evidence from which a reasonable fact finder could conclude that Sanchez responded to this notice with deliberate indifference.

In her letter to Kelly, Ellis-Henry stated that she

> told Mrs. Sanchez to come speak to defendant [Alaniz] in regards to allegations that P.O. Williams had been making sexual advances toward her.  Mrs. Sanchez did speak to the defendant.  When I returned I asked the defendant if she told Mrs. Sanchez and she replied no because she was afraid [of] Mrs. Sanchez.  I encouraged the defendant to contact O[ffice of] I[nspector] G[eneral] and report the situation.[27]

Thus, the undisputed evidence is that when Sanchez learned of Alaniz's complaint she did not fail to take any action but, instead, met with Alaniz to investigate the complaint.  When Alaniz refused to verify the complaint to Sanchez, Sanchez took no further action.  Although Sanchez's response to Alaniz's complaint did not succeed at correcting Williams' misconduct, in light of Alaniz's refusal to verify the complaint and absent any evidence that Sanchez had received any other complaints about Williams' misconduct, the court is not persuaded that Sanchez's response to Alaniz's complaint was unreasonable under the known circumstances. See Doe, 220 F.3d at 384 (officials may avoid liability under a

---

[27]Attachment 11 to Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, p. 2.

deliberate indifference standard by responding reasonably to a risk
of harm, even if the response is unsuccessful).

   3.   Knowledge of Sexually Charged Environment

   Arguing that "[d]efendant State of Texas should remain in this
action and Plaintiff should be allowed to proceed on her Title IX
claim,"[28] plaintiff asserts that "[d]efendant's agent" subjected
probationers and employees alike to a "sexually charged environment
. . . [that] has to be viewed contextually and not isolated to the
acts directed to Alegria."[29]  Plaintiff argues that "[a] contextual
view imports knowledge.  An isolated restricted view would prevent
one from seeing Alegria as a byproduct, victim and/or subject of
[a] dysfunctional system."[30]  As additional evidence that Kelly and
the State of Texas possessed knowledge of other complaints of
sexual harassment in the GCCS&CD, plaintiff cites the deposition
testimony of the Honorable Susan Criss, presiding judge of the
212th Judicial District Court who serves together with other
district judges on the board that oversees the GCCS&CD.  Plaintiff
asserts that when questioned about the state's knowledge of other
complaints of sexual harassment in the GCCS&CD, Judge Criss
testified that inappropriate sexual conduct was extensive at the
GCCS&CD and that Kelly's reaction to complaints of inappropriate

_____

   [28]Plaintiff's Response to Order to Show Cause, Docket Entry
No. 35, p. 22.

   [29]Id. at 23.

   [30]Id.

-27-

sexual conduct was "tantamount to indifference."[31]   Although the list of examples of inappropriate sexual conduct compiled by plaintiff from Judge Criss's testimony is over five pages long,[32] the examples are all related to the actions of three individuals: Bernardo Almaraz, Miguel Ortega, and Travis Scoggins.

(a)  Bernardo Almaraz

Almaraz was a probation officer at the GCCS&CD.  Asserting that Almaraz attempted to assault a Galveston probationer during a home visit, and that Kelly failed to report the incident to the judges on the GCCS&CD's governing board,[33] plaintiff argues that Kelly "concealed the criminal charges against Almaraz"[34] from the judges on GCCS&CD's board, and that Kelly's concealment of these charges evidences deliberate indifference to the sexually charged environment at GCCS&CD.

The summary judgment evidence establishes that on July 1, 2003, a probationer complained to Kelly about inappropriate conduct of a sexual nature between her and her probation officer, Almaraz, that Kelly immediately contacted the Pasadena Police Department to initiate an investigation, that the detectives investigating the

---

[31]Id. at 6.

[32]Id. at 6-11

[33]Id. at 8.

[34]Id.

complaint asked Kelly to let them complete their investigation before he initiated disciplinary action, that on July 10, 2003, the detectives contacted Almaraz for his statement, whereupon Almaraz resigned by leaving a message on his supervisor's office telephone and placing a letter of resignation dated July 11, 2003, in her office mail box.[35] The evidence also establishes that Almaraz was subsequently indicted for official oppression and placed on community supervision for that offense.[36] Although plaintiff argues that Kelly responded with deliberate indifference to Almaraz's conduct because he did not report the incident to GCCS&CD's board until several months after it had occurred and, then, only in response to questioning from the board,[37] plaintiff has failed to present any evidence contradicting the defendants' evidence that Kelly took effective remedial action immediately upon learning of Almaraz's misconduct.   Moreover, plaintiff has also failed to present any evidence from which a reasonable fact finder could conclude that Almaraz's misconduct placed defendants on actual notice that Williams posed a threat to plaintiff or the other probationers that he supervised, that Kelly had a duty to report Almaraz's misconduct to GCCS&CD's board earlier than he did, that

---

[35]Kelly Affidavit, Exhibit A attached to Docket Entry No. 31, second unnumbered page.

[36]Id.

[37]See Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, p. 8 (citing Deposition of Judge Susan Criss, Attachment No. 2 to Docket Entry No. 32, pp. 40-42).

Kelly's failure to report the incident earlier was unreasonable under the circumstances, or that it caused the plaintiff to undergo harassment at Williams' hands, or made plaintiff liable or vulnerable to such harassment. <u>See</u> <u>Gebser</u>, 118 S.Ct. at 1999-2000 (evidence that the defendant failed to comply with DOE regulations was insufficient to satisfy the requisite standards for actual notice and deliberate indifference).

    (b)  Miguel Ortega

Ortega was a probation officer at the GCCS&CD.  Plaintiff argues that Judge Criss's testimony establishes that Ortega sexually harassed court staff and prosecutors by making sexual noises and gestures, and inappropriately touching some of them.[38]

The summary judgment evidence establishes that in early 2004, Ortega was acting in unspecified "sexually inappropriate [ways] in the 122nd District Court towards female employees in the court and the DA's office in the courthouse."[39]  Judge Criss testified that GCCS&CD employees complained that Ortega would harass "women in the lobby by sitting next to them and saying things like, 'Can I kiss you, Cupcake?' and making sexual noises that . . . upset[] people."[40]  In response, Ortega was transferred to a job that did

---

[38]Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, p. 6.

[39]Deposition of Judge Susan Criss, Attachment 2 to Docket Entry No. 32, p. 45.

[40]<u>Id.</u> at 46.

not require his regular presence in the courthouse.  Unsatisfied with Ortega's reassignment, the judges on the GCCS&CD board ordered Kelly to prohibit Ortega from supervising women.[41]  Judge Criss testified that Kelly first ordered Ortega not to supervise pretty women, and only upon further direction reluctantly agreed to order Ortega not to supervise any women.  Judge Criss testified that instead of following Kelly's order, Ortega had women who reported to him for community service sign waivers indicating their agreement to be supervised by him.[42]  Judge Criss also testified that by the time the board learned of Ortega's practice of obtaining waivers from women, Ortega had already been fired.[43]

Judge Criss's testimony shows that GCCS&CD employees complained that Ortega was verbally abusive to others, and that his verbal abuse included sexually laden comments made to probationers in the GCCS&CD's lobby.  However, none of the complaints about Ortega evidence sexually assaultive conduct or fear of sexually assaultive conduct like that to which Williams allegedly subjected the plaintiff.  Moreover, Judge Criss's testimony establishes that neither Kelly nor the GCCS&CD board stood idle in the face of the complaints about Ortega's conduct but, instead, initially took measures aimed at curbing Ortega's ability to engage in such

---

[41]_Id._

[42]_Id._ at 47.

[43]_Id._ at 49.

conduct and, when those failed, terminating Ortega's employment. Although Judge Criss disagreed with Kelly's management of Ortega, plaintiff fails to present any evidence from which a reasonable fact finder could conclude that Ortega's misconduct placed defendants on actual notice that Williams posed a threat to plaintiff or the other probationers that he supervised, caused the plaintiff to undergo harassment at Williams' hands, or made plaintiff liable or vulnerable to such harassment. See Doe v. Taylor Independent School District, 15 F.3d 443, 458 (5th Cir.) (en banc), cert. denied sub nom, Lankford v. Doe, 115 S.Ct. 70 (1994) (superintendent who had actual notice of a pattern of inappropriate sexual behavior was not deliberately indifferent where he took some steps in response to that knowledge even though his steps were ineffective).

      (c)   Travis Scoggins

    Scoggins was a supervisor at the GCCS&CD. Plaintiff argues that Judge Criss's testimony and GCCS&CD records reveal that Scoggins harassed probation officers and other members of the GCCS&CD staff by yelling, cursing, and making sexually explicit gestures,[44] and that despite having both actual knowledge of repeated complaints against Scoggins and supervisory authority over Scoggins, Kelly failed to take corrective action against Scoggins.

---

    [44]Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, p. 7.   See also Deposition of Judge Susan Criss, Attachment 2 to Docket Entry No. 32, pp. 24-25, 74-75.

The summary judgment evidence establishes that beginning as early as July of 2000 and continuing until September of 2003 when Scoggins retired, Kelly received complaints from men and woman alike about Scoggins' violent outbursts and frequent use of profanity.[45]  The evidence also establishes that from time to time Scoggins was subjected to disciplinary action, but that Judge Criss and others decried those disciplinary actions as insufficient to remedy Scoggins' abusive conduct.  The complaints against Scoggins all express fear of his violent temper, verbal abuse, and lack of anger management skills.[46]  None of the complaints against Scoggins evidence sexually assaultive conduct or fear of sexually assaultive conduct like that to which Williams allegedly subjected the plaintiff.  Because in Gebser, 118 S.Ct. at 2000, the Supreme Court held that complaints "charging only that [the alleged wrongdoer] had made inappropriate comments . . . [were] plainly insufficient to alert the [federal funding recipient] to the possibility that [the alleged wrongdoer] was involved in a sexual relationship," the court concludes that evidence that Scoggins displayed a violent temper and engaged in verbal abuse that included profanity was insufficient to alert Kelly or any other supervisory official at the GCCS&CD to the possibility that Williams was sexually abusing the plaintiff.

_____

[45]See Chronology of Complaints Against Travis Scoggins, Attachment 10 to Docket Entry No. 32.

[46]Id.

(d)  Collective Knowledge

For the reasons explained above, the court concludes that the evidence of sexual misconduct attributable to Almaraz, Ortega, and Scoggins is insufficient to raise a genuine issue of material fact for trial because that evidence would not allow a reasonable trier of fact to conclude that an official with supervisory power over Williams knew about his sexual misconduct, had the power to end it, and unreasonably failed to do so.  Nor is the court persuaded that when viewed collectively, the evidence of sexual misconduct attributable to Almaraz, Ortega, and Scoggins, is capable of raising a genuine issue of material fact for trial on grounds that their conduct collectively created a sexually hostile environment.

There are arguably two ways in which sexual harassment in the educational context can constitute gender-based discrimination actionable under Title IX.  See Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 65 (1st Cir. 2002).  Liability can be based upon "quid pro quo" harassment (i.e., receipt of a benefit conditioned on submission to sexual conduct) or on "hostile environment" harassment (i.e., sexual conduct which, inter alia, creates an intimidating environment).  Id.  See also Leija, 101 F.3d at 397.  Although plaintiff argues that "the facts herein reflect both a quid pro quo and a persistent and pervasive harassment,"[47] plaintiff

---

[47]Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, p. 5 n.10.

-34-

testified that apart from the time she spent with Williams, she never felt harassed or uncomfortable at the probation office because she was a woman, and never observed any behavior by any of the other probation officers that she considered inappropriate towards women.[48]   Moreover, plaintiff's allegations that Williams subjected her to unwanted sexual acts constitute allegations of quid pro quo as opposed to hostile environment sexual harassment. Plaintiff has not cited and the court has not found any authority for the proposition that actual notice of a sexually charged (or hostile) environment constitutes actual notice of quid pro quo sexual harassment.   See Gebser, 118 S.Ct. at 2000 (holding that complaints charging only that an alleged wrongdoer made inappropriate comments were insufficient to alert a federal funding recipient to the possibility that the alleged wrongdoer was involved in a sexual relationship); Johnson, 267 F.Supp.2d at 679 (reasoning that actual knowledge of sexually offensive environment did not place school district on actual notice of quid pro quo sexual harassment).

Even if the court were to conclude that the evidence plaintiff has presented of Almaraz's, Ortega's, and Scoggins' misconduct is

---

[48]See Deposition of Dana Alegria, Exhibit B attached to Docket Entry No. 30, pp. 22-23. Although plaintiff argues that Williams made one sexual comment to her before he became her probation officer, one comment by a non-supervising probation officer does not create a sexually hostile environment.  While abhorrent, the lone comment made by Williams to plaintiff prior to becoming her probation officer cannot constitute a sexually hostile environment because it is not pervasive or persistent.

sufficient to show that the GCCS&CD suffered from a sexually charged environment, that evidence would not be sufficient to establish liability under Title IX absent evidence that an official with supervisory authority over the GCCS&CD was both aware of facts from which an inference could be drawn that the sexually charged environment at GCCS&CD posed a substantial risk that plaintiff and/or other probationers would be subjected to sexually abusive quid pro quo conduct and that the official actually drew that inference. See Rosa H., 106 F.3d at 658.

Because plaintiff has failed to present evidence capable of establishing that anyone other than Kelly possessed supervisory power over the GCCS&CD employees, or that when notified of sexual misconduct committed by Almaraz, Ortega, Scoggins, or Williams, Kelly failed to take corrective measures that in all but one of the cases (Scoggins) succeeded in stopping the misconduct, the court is not persuaded that plaintiff has presented evidence from which a reasonable trier of fact could conclude that Kelly responded with deliberate indifference to any known acts of sexually abusive quid pro quo conduct. Moreover, because Scoggins' misconduct involved comments and verbal abuse as opposed to the quid pro quo type of sexual harassment of which the plaintiff complains, the court is not persuaded that plaintiff has presented evidence from which a reasonable trier of fact could conclude that actual knowledge of Scoggins' conduct could have placed the GCCS&CD on notice that

plaintiff faced a substantial risk of being subjected to quid pro quo sexual abuse.

## IV.  Section 1983 Claims for Prospective Injunctive Relief

In response to Williams' motion to dismiss the § 1983 claims asserted against him in his official capacity, plaintiff acknowledged that she could not recover damages for past constitutional violations, but argued that she could seek and properly obtain prospective injunctive and declaratory relief from the State.  Noting that "[i]t is somewhat unclear exactly what injunctive relief Plaintiff is seeking,"[49] and that "Plaintiff generally describes her desire for a 'policy to protect females' in her Complaint,"[50] the court initially declined to grant Williams' motion to dismiss plaintiff's claims for prospective injunctive and declaratory relief in "hopes that the relief sought by Plaintiff and the legal authority allowing such relief will be more fully hashed out in future dispositive motions and responses thereto."[51]

In its September 11, 2007, Memorandum Opinion and Order, the court stated that

> [s]ince it is undisputed that Williams is no longer
> employed by the GCCS&CD, and since the court has already
> concluded that Kelly is entitled to summary judgment

---

[49]Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, Docket Entry No. 15, p. 3 & n.4.

[50]Id.

[51]Id.

-37-

based on qualified immunity, the court is also inclined to grant summary judgment <u>sua sponte</u> on the § 1983 claims for prospective injunctive [and declaratory] relief that plaintiff has asserted against Williams and Kelly in their official capacities because the plaintiff has failed to demonstrate a pattern of similar violations arising from lack of training or supervision that is so clearly inadequate as to be obviously likely to result in a future constitutional violation. <u>See</u> <u>Henschen v. City of Houston, Tex.</u>, 959 F.2d 584, 588 (5th Cir. 1992 (quoting <u>O'Shea v. Littleton</u>, 94 S.Ct. 669, 675-76 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, [] if unaccompanied by any continuing, present adverse effects.")).[52]

In response plaintiff asserts that her

Third Amended Complaint does not assert injunctive relief, therefore there is no need to brief this issue — however, Plaintiff did request declaratory relief (see paragraph 41).[53]

The court construes plaintiff's statement that she is no longer seeking prospective injunctive relief as an abandonment of those claims.

## V.   <u>Conclusions and Order</u>

For the reasons explained above, the court <u>sua sponte</u> **GRANTS** defendants summary judgment on the Title IX claims alleged against Williams and Kelly in their individual capacities, and the Title IX and § 1983 claims alleged against the State of Texas and against Williams and Kelly in their official capacities.  Since the court

---

[52]Docket Entry No. 34, pp. 39-40.

[53]Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, p. 2.

has already dismissed the § 1983 claims for monetary damages asserted against the State of Texas and against Kelly and Williams in their official capacities and against Kelly in his individual capacity, the only claim remaining in this action is the § 1983 claim for monetary damages alleged against Williams in his individual capacity.

Discovery against Williams will be completed by December 21, 2007.  The joint pretrial order will be filed by January 4, 2008. Docket call will be on January 11, 2008, at 4:00 p.m., in Court Room 9-B, 9th Floor, United States Courthouse, 515 Rusk Avenue, Houston, Texas.

**SIGNED** at Houston, Texas, on this 2nd day of November, 2007.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE